IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 1, 2021

## WANDA CAVALIERE ET AL. v. STATE OF TENNESSEE

**Appeal from the Tennessee Claims Commission**
**No. T20180859      James A. Haltom, Commissioner**
_____

### No. M2021-00038-COA-R3-CV
_____

This appeal arises from proceedings in the Tennessee Claims Commission and follows a trial concerning care received by the decedent while at the Tennessee State Veterans Home. The Claims Commission ultimately found that the claimants had failed to establish a health care liability claim and therefore dismissed the case. For the reasons stated herein, we affirm the judgment of dismissal.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Claims Commission
Affirmed; Case Remanded**

ARNOLD B. GOLDIN, J., delivered the opinion of the Court, in which ANDY D. BENNETT, and JOHN W. MCCLARTY, JJ., joined.

M. Chad Trammell, Texarkana, Arkansas, and Deborah Truby Riordan, Little Rock, Arkansas, for the appellants, Wanda Cavaliere, Larry Askins, and Fonda Blair.

Herbert H. Slatery, III, Attorney General and Reporter, Andrée Sophia Blumstein, Solicitor General, and Stephanie Bergmeyer, Senior Assistant Attorney General, for the appellee, State of Tennessee.

## OPINION

### BACKGROUND AND PROCEDURAL HISTORY

The Claimants in this case are the children of Edward Clifford Askins. Mr. Askins passed away on October 25, 2016, a few days following his transfer from the Tennessee State Veterans Home in Murfreesboro ("Veterans Home") to the hospital. Efforts were subsequently initiated to hold the State of Tennessee liable for alleged negligent care Mr. Askins received while he was a resident at the Veterans Home. Under the operative

complaint filed in the Tennessee Claims Commission ("the Claims Commission"), the Claimants asserted that their father had been a resident at the Veterans Home from April 30, 2013 until on or about October 21, 2016. The Claimants' complaint asserted the existence of violations under Tennessee's Health Care Liability Act and set forth a number of injuries for which recovery was sought, including Mr. Askins' death. A trial on the matter was eventually held in the Claims Commission in September 2020.

In a thorough and detailed order entered on December 10, 2020, the Claims Commission concluded that the Claimants had failed to establish a health care liability claim against the State and therefore dismissed the case. In relevant part, the Claims Commission concluded, among other things, that employees of the Veterans Home followed the standard of care with respect to treatment for prevention of aspiration pneumonia, that employees met the standard of care for proper hydration of Mr. Askins, and that the Claimants' expert had not opined "as to whether or not the presence of any skin injury was the proximate result of an act or omission by Defendant." The Claimants thereafter timely filed an appeal with this Court.

## DISCUSSION

*General Law Pertinent to the Claimants' Claims and our Review on Appeal*

Under the Tennessee Code, the Claims Commission has "exclusive jurisdiction to determine all monetary claims against the state based on the acts or omissions of 'state employees,' as defined in § 8-42-101," with respect to a number of categories of claims. Tenn. Code Ann. § 9-8-307(a)(1). Included among the delineated categories of claims is one that encompasses "health care liability by a state employee; provided, that the state employee has a professional/client relationship with the claimant." Tenn. Code Ann. § 9-8-307(a)(1)(D). As a general proposition, competent expert testimony must be present to support a health care liability claim, *see Akers v. Heritage Med. Assocs., P.C.*, No. M2017-02470-COA-R3-CV, 2019 WL 104130, at *5 (Tenn. Ct. App. Jan. 4, 2019), and by statute, health care liability claimants must prove the following:

> (1) The recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community in which the defendant practices or in a similar community at the time the alleged injury or wrongful action occurred;
> (2) That the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standard; and
> (3) As a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred.

Tenn. Code Ann. § 29-26-115(a).

As noted previously, the Claims Commission concluded that the Claimants had failed to establish a health care liability claim, finding, among other things, that employees of the Veterans Home followed the standard of care with respect to treatment for prevention of aspiration pneumonia and had met the standard of care for proper hydration of Mr. Askins. Before turning to the Claims Commission's specific determinations and the Claimants' raised grievances on appeal about same, we first outline the standards governing our review.

Our review of the Claims Commission's factual findings is de novo upon the record, with a presumption of correctness, unless the preponderance of the evidence is otherwise. *Mathews v. State*, No. W2005-01042-COA-R3-CV, 2005 WL 3479318, at *3 (Tenn. Ct. App. Dec. 19, 2005). "We accord great deference to the Claims Commission's determinations on matters of witness credibility and will not re-evaluate such determinations absent clear and convincing evidence to the contrary." *Skipper v. State*, No. M2009-00022-COA-R3-CV, 2009 WL 2365580, at *2 (Tenn. Ct. App. July 31, 2009). The presumption of correctness afforded to the Claims Commission's factual findings does not extend to its legal conclusions. *Bowman v. State*, 206 S.W.3d 467, 472 (Tenn. Ct. App. 2006). We employ an abuse of discretion standard with respect to the Claims Commission's evidentiary rulings. *In re Demitrus M. T.*, No. E2009-02349-COA-R3-CV, 2011 WL 863288, at *14 (Tenn. Ct. App. Mar. 14, 2011).

In addition to these general considerations, we note that our review on appeal can be impacted by the adequacy of the briefing that is presented to us. An issue can be deemed waived "when it is argued in the body of the brief, but not designated as an issue on appeal." *In re Conservatorship of Osborn*, No. M2020-01447-COA-R3-CV, 2021 WL 5144547, at *7 (Tenn. Ct. App. Nov. 5, 2021). Similarly, an issue can be deemed waived where it is raised without appropriate argument regarding its merits. *Bean v. Bean*, 40 S.W.3d 52, 56 (Tenn. Ct. App. 2000). "Courts have routinely held that the failure to make appropriate references to the record and to cite relevant authority in the argument section of the brief as required by Rule 27(a)(7) [of the Tennessee Rules of Appellate Procedure] constitutes a waiver of the issue." *Id.* at 55. Parties "cannot expect this court to do its work for them," and we are "under no duty to verify unsupported allegations in a party's brief." *Id.* at 56.

*Examination of the Claimants' Issues*

At the time of his passing, Mr. Askins was over ninety years old. Medical records introduced at trial revealed that he had suffered from a variety of medical concerns in the latter stages of his life, including, but not limited to, aspiration pneumonia, hypercalcemia, and Parkinson's disease. Hospital records from September 2016 contained a doctor notation advising "comfort oriented care including hospice service." Moreover, it was also noted that Mr. Askins' "dehydration with hypercalcemia is likely to be replayed over again." Notably, another notation—one in Mr. Askins' discharge summary from his

- 3 -

September 2016 hospital visit—referenced an expectation of "frequent admissions to the hospital for hypercalcemia, pneumonia, and UTI etc."

Mr. Askins was ultimately transferred to the hospital again on October 21, 2016, after labored breathing was observed. He passed away a few days later on October 25, 2016, after comfort care measures were implemented. A record from the hospital lists his final principal diagnosis as "[p]neumonitis." Although the Claimants have attempted to attribute Mr. Askins' injuries in this case to alleged negligent behavior, the State has attempted to establish that its employees met the standard of care and did not cause the injuries about which the Claimants complained.

In their appellate brief, the Claimants raise the following issues for our review:

I.      Whether the Commission's findings that the standard of care was met and that no harm resulted to Mr. Askins are against the preponderance of the evidence and constitute a complete disregard of substantial, relevant evidence of fraudulent charting?

II.     Whether the Commission erred in precluding entry of personnel records of the State's witness Jerry Traughber that demonstrated similar behavior and impeached her testimony?

III.    Whether the Commission erroneously limited the weight of evidence of short-staffing in the facility?

IV.     Whether the Commission erroneously permitted the State's expert to render new, previously undisclosed opinions, prejudicing Claimant[s]?

In turning to the specific concerns implicated by the Claimants' first raised issue, we begin our substantive engagement with the Claims Commission's action by addressing its finding that the standard of care was followed with respect to treatment for prevention of aspiration pneumonia. Although the Claimants argue that the record does not support the Claims Commission's finding, we respectfully disagree. The State's expert, Dr. William Boger ("Dr. Boger"), testified that the staff at the Veterans Home had met the standard of care. He noted that the standard of care concerning this matter primarily required "elevating the head of the bed approximately 30 degrees" and "checking for any post-fluid residuals when they're doing tube feeding." He noted that there was evidence that both of these care requirements were followed. Although the Claimants appear to suggest that there is a lack of sufficient evidence to support a conclusion that the facility staff had actually followed the standard of care that Dr. Boger testified was required, the argument advanced by the Claimants is tied largely to their concern about a lack of documentation. They argue, for instance, that there is a lack of adequate documentary evidence concerning the performance of the care requirements at issue. As to this concern, we observe that certain testimony at trial indicated that staff generally "chart by exception." Further, although the Claimants point to testimony of some witnesses in an attempt to bolster their assertion that proper care was not provided, we observe that two of these witnesses, who

- 4 -

testified that they had in the past seen beds not elevated in the Veterans Home, had not worked at the facility in nearly a year and a half prior to the events surrounding Mr. Askins' October 2016 transfer to the hospital. By way of contrast with this somewhat general and temporally remote testimony, the testimony of two nurses, Tina Barnes ("Nurse Barnes") and Jerry Traughber ("Nurse Traughber"), testified that the actions required by the standard of care had been specifically met as to Mr. Askins. Nurse Barnes testified that, during September and October 2016, she never observed Mr. Askins' bed at an improper elevation. Likewise, Nurse Traughber testified that the proper elevation of his bed was "just automatic. That's literally an automatic." As to the obligation to check residuals, Nurse Barnes testified that she checked residuals when the feeding tube was turned off and on, while also checking residuals incident to giving medication. Nurse Traughber also testified to what her efforts had entailed in checking Mr. Askins' feeding tube.

The Claims Commission clearly appears to have accredited the testimony of Dr. Boger, Nurse Barnes, and Nurse Traughber in connection with its findings, and we can discern no reversible error for its decision to do so. Whereas the Claimants urge this Court to "look at the outcome" experienced by Mr. Askins, evidence of an adverse medical outcome is by no means a substitute for proving a breach of the standard of care or for proving that an alleged breach of the standard of care was a proximate cause of the harm. *See* Tenn. Code Ann. § 29-26-115(d) (providing that "injury alone does not raise a presumption of the defendant's negligence"); *Kilpatrick v. Bryant*, 868 S.W.2d 594, 599 (Tenn. 1993) (explaining that "the mere occurrence of an injury does not prove negligence, and an admittedly negligent act does not necessarily entail liability").

Relatedly, we also can discern no error in the Claims Commission's decision to accredit the State's expert as to the cause of Mr. Askins' aspiration pneumonia as opposed to the expert proffered by the Claimants. Whereas the Claimants' expert, Dr. Timothy Klein ("Dr. Klein"), attributed the cause of Mr. Askins' aspiration pneumonia to alleged negligence, the Claims Commission observed that Dr. Klein had stated that he "didn't see" documentation in Mr. Askins' medical records suggesting that there was "a chronic issue with aspiration where he had had recurrent hospitalizations for aspiration pneumonia." The Claims Commission, however, highlighted in its order the evidence that existed as to Mr. Askins' past history with aspiration pneumonia, including evidence of hospitalizations and a discharge summary noting that there should be an expectation of "frequent admissions" for pneumonia. Dr. Boger, after testifying to a variety of underlying conditions Mr. Askins had suffered from, opined that Mr. Askins had been at a high risk of developing aspiration pneumonia "regardless of what actions [the staff at the Veterans Home] took." Although the Claims Commission did not find Dr. Klein's opinion as credible as Dr. Boger's due to his apparent failure to properly consider Mr. Askins' medical history, the Claims Commission observed that Dr. Klein had acknowledged that aspiration pneumonia could occur in the absence of any negligence.

In connection with our discussion above, we note that the Claimants appear to take

specific issue with alleged negligence committed on the last two days Mr. Askins was at the Veterans Home in their attempt to challenge the Claims Commission's finding that Mr. Askins suffered no injury as a result of care provided by facility employees. They argue that, on October 20, 2016, a physician should have been informed that Mr. Askins was suctioned three times. Concerning this matter, Dr. Boger had specifically testified that the suctioning did not require a notification to a physician. He noted that there "was an order for suction as needed" and explained that "there would be no reason to contact the physician regarding that; that they had suctioned somebody successfully." Nurse Barnes, who was the one who had suctioned Mr. Askins on October 20, testified that she had not observed any signs of distress. Moreover, as the State points out—and the Claims Commission found in its order—a physician did later see Mr. Askins on October 20 and also observed no signs of distress.

As for the next day, October 21, it is the Claimants' position that Mr. Askins was not transferred from the Veterans Home quickly enough, notwithstanding Dr. Boger's expert opinion that the transfer to the hospital was done appropriately. In support of their contention that the staff improperly delayed its response, the Claimants point to, in part, evidence that conditions of labored breathing had been noted by a respiratory therapist earlier in the day at 12:45. The Claimants argue that Nurse Traughber's testimony that she first saw evidence of labored breathing several hours later is not credible. Alternatively, they suggest that the failure to identify alleged distress before then was a violation of the standard of care. It should be noted, however, although evidence of labored breathing had previously been observed by a respiratory therapist on October 21, certain notes from the therapist indicated that Mr. Askins initially had positive responses to the therapy assessment. This evidence casts doubt, therefore, on the Claimants' insinuation that signs of distress should have been identified earlier so as to prompt a transfer. Indeed, medical symptoms can dissipate and recur, and here, the Claims Commission accredited the testimony that Nurse Traughber notified her supervisor for appropriate care when she observed labored breathing at 3:50 p.m. It specifically found that "[s]he had not observed [labored breathing] through the day or had reports from other staff of any distress."

Regarding the subject of dehydration, the Claimants contend that the evidence preponderates against the conclusion that acts or omissions of Veterans Home employees did not cause Mr. Askins' injury. We disagree. The Claims Commission's order on this topic, once again, largely accepted the testimony of Dr. Boger as opposed to Dr. Klein. We fail to find any error in the Claims Commission's decision to do so. The Claims Commission observed that Dr. Klein's testimony was somewhat unclear regarding this issue, as it noted that Dr. Klein had opined in one place during his testimony that spills of Mr. Askins' feeding tube "might have been" the reason for dehydration. Such speculation, of course, is not sufficient medical expert testimony. See *Kellon v. Lee*, No. W2011-00195-COA-R3-CV, 2012 WL 1825221, at *6 n.8 (Tenn. Ct. App. May 21, 2012) (noting that causation is a matter of probability, not possibility, and that proof pertaining to what "might have," "may have," or "could have" occurred is not sufficient). The Claims Commission

ultimately concluded that spills of Mr. Askins' tube did not contribute to his dehydration, as it accredited evidence indicating that the staff would "address it, stop it, reinsert it, restart it, flush it, [and] get it going again."

Although the Claimants submit on appeal that there "is no excuse for [Mr. Askins'] dehydration," the State is not strictly liable here just because an injury has occurred. The elements of a health care liability claim must still be proven, and we note, similar to his testimony about aspiration pneumonia, even Dr. Klein acknowledged that dehydration can occur in the absence of any negligence. Moreover, there was significant proof here before the Claims Commission pointing to Mr. Askins' underlying medical conditions, including chronic hypercalcemia, as the cause of his dehydration. In fact, as we noted earlier, roughly a month before his death, it had been noted in hospital records that Mr. Askins' "dehydration with hypercalcemia is likely to be replayed over again."

We also find no reason to disturb the Claims Commission's findings concerning the issue of bed sores. As the Claims Commission explained, "Dr. Klein did not opine as to whether the presence of any skin injury was the proximate result of an act or omission by Defendant." Although the Claimants' brief offers some argument on the bed sore causation question, it notably offers no response contesting the Claims Commission's finding about the inadequacy (by omission) of Dr. Klein's testimony on the issue.

In support of their general contention that the State's defense in this case is not credible, the Claimants appear to argue in part that evidence of "fraudulent charting" dictates a reversal of the Claims Commission's conclusions. Indeed, in an attempt to advance their point that the Claims Commission's dismissal should be reversed, the Claimants point to acknowledged incorrect entries in Mr. Askins' medical records. Respectfully, the fact that certain records at the Veterans Home contained errors did not compel the Claims Commission to reject the accuracy of the entirety of the records or otherwise require the Claims Commission to disbelieve the State's witnesses regarding the care that Mr. Askins received.[1]

---

[1] Whereas the Claimants further specifically posit that the contents of a particular "Minimum Data Set" record call into question the State's defenses regarding Mr. Askins' medical history, there was evidence at trial explaining that the Minimum Data Set record has a seven-day lookback period and is subject to certain rules that do not make the record interpretable by a layman's understanding. By way of example, consider the following colloquy, occurring during Nurse Barnes' testimony, that addressed the prognosis section on the Minimum Data Set record at issue:

> Q. And there's a prognosis section on the minimum data set. "Does the resident have a condition or chronic disease that may result in a life expectancy of less than six months?" Answer is what?

> A. It says "no." The reason it says "no," the rules for that, you have to have -- somebody has to be, like, hospice or specific progress note from the physician saying his life expectancy is six months or less.

As for the Claimants' raised issue about "[w]hether the Commission erroneously limited the weight of evidence of short-staffing in the facility," we initially note that this issue, as phrased, does not nominally challenge the exclusion of evidence or entail consideration of issues beyond the subject matter of "short-staffing." We restrict our discussion and engagement with the Claimants' proffered argument accordingly.[2] The Claimants' articulated grievance concerning the "short-staffing" issue is tied to the Claims Commission's comments about the testimony of Nurse Delacey Hillis ("Nurse Hillis"). Namely, the Claimants complain that the Claims Commission indicated it would give "very little" weight to Nurse Hillis' testimony regarding staffing levels. In relevant part, the Claims Commission had observed at trial that Nurse Hillis "didn't work [at the Veterans Home] for 18 months before the decedent passed."

We find no reversible error in the Claims Commission's expression of an intention to limit the weight that should be given to testimony that was temporally remote to the care received by Mr. Askins in the last year and a half of his life, especially in light of some of the other evidence that existed as to staffing levels. Certain testimony offered at trial reflected that staffing levels at the Veterans Home exceeded federal requirements. Moreover, Nurse Barnes testified that she was able to take care of residents during her shifts and that she had observed technicians having time to take care of the residents, a point the Claims Commission took note of in its order. As it is, although the Claimants criticize the Claims Commission's announced decision to discount Nurse Hillis' testimony, their counsel acknowledged at trial that such a result could be warranted based on the timing of when Nurse Hillis had stopped working at the Veterans Home. Indeed, in relevant part, the Claimants' counsel stated as follows: "Now, the fact that while that's a little bit back, I think that might go to the bearing on the weight of the evidence."

---

Q. So as of October 21st, no physician had said that Mr. Askins had a life expectancy of six months or less; correct?

A. Well, they didn't give written -- it has to be written -- specifically written in certain words to be -- the rules for an MDS are different than just layman's terms, me and you talking.

The Claimants appear to argue that, because certain medical ailments were not evidenced by the Minimum Data Set at issue, that should be the end of the story because the Minimum Data Set is, they submit, a "critical document that must be accurate under penalty of criminal sanctions." Putting aside consideration of the evidence discussed above pertaining to the specific context in which a Minimum Data Set is prepared, we fail to see why the Claims Commission was foreclosed from relying upon the existence of a medical ailment on the basis of other records. Consider the issue of Mr. Askins' hypercalcemia. Although the Claimants argue that this was "NOT on . . . [Mr. Askins'] MDS" and therefore appear to reason that it should not be considered as a problem, we note extensive documentation of this condition elsewhere, including in documentation from a visit to the hospital that occurred in September 2016.

[2] The associated argument section in the Claimants' brief appears to, in part, take issue with the exclusion of certain testimony from Nurse Angela Dyer concerning medication record completion practices.

The rest of our discussion on appeal involves a number of evidentiary concerns raised by the Claimants. In the section of their brief devoted to the events surrounding Mr. Askins' transfer to the hospital in October 2016, the Claimants offer an argument related to alleged wrongful exclusion of evidence pertaining to Nurse Traughber, their second denominated issue on appeal. We conclude that the Claimants have waived this issue due to their failure to offer any citation to legal authority in support of it. *Bean*, 40 S.W.3d at 55 (noting that "the failure . . . to cite relevant authority in the argument section of the brief as required by Rule 27(a)(7) constitutes a waiver").

The remaining evidentiary matters raised by the Claimants are set forth in connection with their last issue presented, in which the Claimants contend that the Claims Commission erred in allowing certain testimony from Dr. Boger. The subject matter of the testimony complained of can be broken down into three general areas: (1) a statement about the efficacy of bed elevation measures, (2) Dr. Boger's discussion of myeloma, and (3) Dr. Boger's discussion of the transfer of Mr. Askins to the hospital. As to each of these discrete topics, the Claimants generally complain that Dr. Boger's testimony extended into matters for which no antecedent disclosure had been given.

Having reviewed the Claimants' brief, we conclude that we are unable to meaningfully review this specific argument. Although statements are repeatedly made throughout the Claimants' brief as to the alleged insufficiency of the State's expert disclosures, no proper citation is given to the record as to where these expert disclosures can be found.[3] We are thus left to speculate whether there is, in fact, any foundational basis

---

[3] The only citation that appears to be given for the contents of the disclosures relates to *argument* from the State's counsel at trial as to a portion of what the disclosures evidently contained. The Claimants offered this citation in support of their objection to Dr. Boger's testimony about myeloma. Even assuming *arguendo* that it was somehow proper to treat the State's counsel's argumentative comments at trial as definitively capturing the precise scope of its disclosures in the absence of any actual proof of same and in the absence of a copy of the disclosures themselves, the representations conveyed in the State's counsel's argument at trial do not appear to suggest that the testimony about myeloma was out of bounds in any way. Interjecting after the Claimants' objection to Dr. Boger's testimony had been overruled, the State's counsel stated in passing as follows: "I would just like to state for the record, I guess, that we did disclose that his opinion would be Mr. Askins had chronic health conditions and that it's more likely the injury occurred as a result of his multiple comorbidities than any act of the nursing staff." As the State aptly observes in its brief, myeloma is discussed throughout Mr. Askins' medical records. One progress note, for instance, mentions how his myeloma "is likely progressing." Moreover, one of Mr. Askins' children testified that a doctor had previously ordered a "special liquid" for her father "because of his multiple myeloma." As to the first area of testimony complained about by the Claimants, it is unclear to us what reversible error exists even if we were to assume that Dr. Boger's comments pertaining to efficacy of bed elevation were not covered by the expert disclosures. Indeed, the Claimants' articulated concern appears to be that Dr. Boger's comments represented an undisclosed *causation* opinion. As it is, we have already determined that the Claims Commission committed no error in finding that there had been no breach of the standard of care relative to the elevation of Mr. Askins' bed. If there is *no breach* of the standard of care, any causation questions stemming from an alleged breach are of no moment.

for the argument advanced. As previously outlined, parties "cannot expect this court to do its work for them," and we are "under no duty to verify unsupported allegations in a party's brief." *Bean*, 40 S.W.3d at 56.[4]

## CONCLUSION

In light of the foregoing discussion, we are of the opinion that the Claimants' raised issues on appeal are all either without merit or are waived. Accordingly, the judgment of the Claims Commission is affirmed.

s/ Arnold B. Goldin
ARNOLD B. GOLDIN, JUDGE

---

[4] We did nonetheless attempt to see if the expert disclosures were preserved in the record transmitted to us on appeal but without any success.